# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **MATTHEW LEE RATCLIFFE,** ) | |
| ) | |
| Plaintiff, ) | Case No. 7:16CV00582 |
| ) | |
| v. ) | **OPINION AND ORDER** |
| ) | |
| ) | By: James P. Jones |
| **BOBBY RUSSELL, ET AL.,** ) | United States District Judge |
| ) | |
| Defendants. ) | |

*Matthew Lee Ratcliffe, Pro Se Plaintiff; Christopher F. Quirk, Sands Anderson, PC, Richmond, Virginia, for Defendants.*

The plaintiff, Matthew Lee Ratcliffe, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983, alleging that he did not receive appropriate medical care for his vision problems while in jail. Upon review of Ratcliffe's Amended Complaint, his exhibits, and the parties' cross motions for summary judgment, I conclude that the defendants' motion must be granted, and that Ratcliffe's motion must be denied.

I.

A. Undisputed Evidence.

Ratcliffe was incarcerated at the Western Virginia Regional Jail ("the jail") in Salem, Virginia, from June 10, 2016, until February 28, 2017.[1] Dr. MacDonald was the jail's Medical Director. According to the jail's procedures, within his training and experience as a primary care physician, Dr. MacDonald evaluated inmates for medical complaints, including declining vision. If he determined that he could not properly treat an inmate's condition, he would order his staff of licensed practical nurses ("LPNs") to arrange for examination of that inmate by an outside medical specialist.

During an intake medical review on June 10, 2016, an LPN recorded Ratcliffe's visual acuity test results as 20/20, with no pre-existing vision problems. On July 18, Ratcliffe filed a request for free reading glasses, complaining that the fluorescent lighting was adversely affecting his vision. On August 9, 2016, defendant Deborah Quesenberry, LPN, ("Nurse Quesenberry") informed Ratcliffe that he could order reading glasses from the commissary, but that she could not provide him with free reading glasses until he had remained indigent for a total of

---

[1] This summary of evidence is based on Ratcliffe's submissions and the defendants' exhibits, including medical records kept in the normal course of business, as authenticated by David MacDonald, D.O. ("Dr. MacDonald"). Mem. Supp. Mot. Summ. J. Ex. 3, MacDonald Decl. ¶ 2, ECF No. 52-3.

ninety days.  After his records showed ninety days of indigency, the nurse provided him with reading glasses on September 27, 2016.

Nurse Quesenberry performed a visual acuity test on November 4 at Ratcliffe's request.  This test is "a subjective exam where the patient indicates his ability to see letters on a chart, which get progressively smaller as the test proceeds."  Mem. Supp. Mot. Summ. J. Ex. 2, Quesenberry Decl. ¶ 5, ECF No. 52-2.  Ratcliffe's responses to his test indicated that he had 20/70 visual acuity.  The nurse documented these results so the doctor could monitor Ratcliffe's condition and order outside care if he found it to be medically appropriate.  As an LPN, Nurse Quesenberry was not licensed to diagnose Ratcliffe's condition herself or to decide whether it required evaluation by an outside specialist or any prescription treatment.  Dr. MacDonald states that 20/70 "falls at the lower threshold for moderate low vision."  *Id*., Ex. 3, MacDonald Decl. ¶ 6, ECF No. 52-3.  In the doctor's judgment, this test result did "not present a serious medical need" or warrant evaluation by outside specialist.

On November 23, 2016, Superintendant Bobby Russell received Ratcliffe's Formal Inmate Grievance Form - Step II, asking for examination by an eye doctor because his visual acuity had tested as 20/70 on November 4.  Before responding, Russell reviewed Ratcliffe's medical records.  As is his normal practice, Russell deferred to the doctor's medical judgment and advised Ratcliffe, "This

measurement does not meet an established level of vision requiring additional treatment. Therefore, you will not be sent to an outside eye specialist at this time." V.S. Attach. 11, ECF No. 2.

In January 2016, Ratcliffe filed medical requests complaining that his blurry vision was causing him headaches. Medical staff provided him Tylenol. Ratcliffe also asked for another visual acuity test, lab tests, and Excedrin, but staff refused these requests. They advised him that he could purchase different medication in the commissary. They also informed him that if he disagreed with the opinion of the jail's medical provider about his care, he could see an outside eye doctor if he prepaid the $200 cost. When Ratcliffe's mother brought him eye glasses, the jail would not let him use them at the jail without first seeing an eye doctor.

On February 10, 2017, the medical staff performed another visual acuity test on Ratcliffe to compare with the test performed in November. This test indicated that his visual acuity was still 20/70. Shortly thereafter, Russell received a second letter from Ratcliffe, complaining about his vision problems. At this point, given Ratcliffe's many complaints about his vision, Russell decided that arranging for Ratcliffe to be evaluated by an outside specialist was "necessary for the orderly administration of medicine" at the jail. Mem. Supp. Mot. Summ. J. Ex. 1, Russell Decl. ¶ 2, ECF No. 52-1. Specifically, Russell thought this referral "could only benefit [Ratcliffe] and potentially reduce the stress that [he] would place on the

administrative resources of [the jail] to respond to his myriad complaints." *Id.* at ¶ 7. Russell states that in so doing, he "did not second-guess the medical judgment of [the jail's medical] providers regarding [Ratcliffe's] vision requests." *Id.*

After receiving Ratcliffe's February visual acuity test results, Dr. MacDonald evaluated the inmate again on February 17 and performed a fundus examination to check for retina problems, with negative results. Nevertheless, because of Ratcliffe's continued complaints, Dr. MacDonald ordered staff to make arrangements for the inmate to be evaluated by an ophthalmologist. Before an appointment could be secured, however, Ratcliffe was transferred to a state prison facility on February 28, 2017.

Dr. MacDonald states that he did not "ha[ve] any objective clinical basis to believe that [Ratcliffe] had a serious medical condition that required outside care" while he was incarcerated at the jail. MacDonald Decl. ¶ 8, ECF No. 52-3. The doctor

> testif[ies], to a reasonable degree [of] medical certainty, that [Ratcliffe] did not suffer any serious degradation in his vision because he did not see an ophthalmologist after his first eye exam on November 4, 2016 and before February 28, 2017. Any claim that such a delay caused a serious eye injury . . . [is] speculation and inconsistent with his presentation throughout that period.

*Id.* Dr. MacDonald, Nurse Quesenberry, and Russell state that, at no time, did they believe that Ratcliffe's vision problems required different medical treatment than he received while at the jail.

Ratcliffe presents evidence that after his transfer, he was evaluated by an optometrist, Guy A. Dietels, O.D., on May 25, 2017. According to Ratcliffe, Dr. Dietels determined that Ratcliffe has "stigma [sic] in both eyes" and is also both "far sighted and near sighted."[2] Pl.'s Resp. Mot. Summ. J. 2, ECF No. 54. Based on these findings, Dr. Dietels ordered Ratcliffe some new glasses.

B. Procedural Background.

Ratcliffe's initial Complaint with a number of documents attached did not allege what actions each named defendant had undertaken to violate his constitutional rights. Ratcliffe later submitted several additional, often unlabeled pleadings with attachments that the court construed and docketed as additional evidence. Reviewing this history, the magistrate judge notified Ratcliffe that his piecemeal submissions did not state any actionable claim or constitute a proper complaint and granted him an opportunity to file an amended complaint. Ratcliffe did so, and the court then accomplished service upon the defendants named in that pleading, Russell and Nurse Quesenberry.

Liberally construed, Ratcliffe's Amended Complaint alleges the following § 1983 claims: (1) Nurse Quesenberry knew that tests showed Ratcliffe's visual acuity had gotten worse between June and November 2016, but did not grant his

---

[2] I assume that this diagnosis was *astigmatism*, "a common and generally treatable imperfection in the curvature of [the] eye that causes blurred distance and near vision." Mayo Clinic Staff, *Astigmatism*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/astigmatism/symptoms-causes/syc-20353835 (last visited Mar. 23, 2018).

requests for blood work, eye glasses, and referral to the eye doctor at jail expense; (2) Nurse Quesenberry and Russell knew Ratcliffe's visual acuity had gotten worse and he was complaining of headaches and dizziness, but failed to provide at jail expense different medical care than the jail's doctor prescribed; (3) Nurse Quesenberry denied Ratcliffe an appointment with an outside eye doctor based on his indigency; and (4) Russell is responsible for delays Ratcliffe experienced in using the jail's grievance procedures. Ratcliffe also alleges that both defendants negligently failed to provide him adequate vision care. As relief, he seeks compensatory damages.

Ratcliffe has filed a Motion for Summary Judgment that incorporates his previously submitted evidence. The defendants have responded by filing a cross Motion for Summary Judgment, supported by declarations and other documentation. Ratcliffe has responded with his own declaration and additional exhibits. I find the competing motions ripe for disposition.[3]

---

[3] In Ratcliffe's final response to the defendants' motion, he claims that he did not receive a response to a pleading that the court construed as his Requests for Production of Documents. The defendants thereafter notified the court that they had mailed their responses to Ratcliffe's requests for the second time. Since that notice, Ratcliffe has not filed any additional response to the defendants' motion, nor has he demonstrated an inability to obtain any particular document necessary for him to respond fully to the defendants' motion. *See* Fed. R. Civ. P. 56(d). Accordingly, I conclude that the dispositive motions are ready to be decided.

## II.

### A. Summary Judgment Standard.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only [material] disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Asserted facts can be supported by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations," among other things. Fed. R. Civ. P. 56(c)(1)(A). An affidavit or declaration so offered "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In the Fourth Circuit, verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

To survive the opposing party's motion, each nonmovant must present "sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim[s] at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). In addressing each of the motions, I must view the record as a whole and draw all reasonable inferences from the *facts* in the light most favorable to the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). On the other hand, the nonmovant "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.[4] Mere groundless generalizations and unsupported speculations cannot create a genuine issue of *fact* and are thus insufficient to defeat a summary judgment motion. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992).

B. No Constitutional Claims.

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated the party's constitutional rights. *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). "Deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). The inmate must prove that, objectively, he was

---

[4] I have omitted internal quotation marks, alterations, or citations here and throughout this opinion, unless otherwise noted.

suffering from a serious medical need and that, subjectively, the defendant was deliberately indifferent to that need, meaning that he was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994);

Objectively, the inmate's medical condition must be "serious." *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (finding no expectation that prisoners will be provided with "unqualified access to health care"). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

The defendants' evidence is that Dr. MacDonald rated Ratcliffe's 20/70 visual acuity as moderately low vision that, combined with his medical history, did not require referral to an eye doctor. In response, Ratcliffe offers nothing more than his speculative beliefs as a person with no medical training. He believed that his rapid vision change reflected an obvious risk of a serious medical problem as its root cause, such as diabetes or cancer, and that this risk mandated immediate evaluation by an eye specialist. He also believed that his vision issues caused him to suffer migraine headaches and that lack of specialized treatment would allow his vision to worsen. Ratcliffe's speculation about the causes or effects of his visual acuity change is insufficient to present a genuine issue of fact on which he could

persuade a jury to find that his vision issues constituted a serious need for immediate care by a specialist while he was at the jail.[5]

Even if I were to assume that Ratcliffe's vision-related problems at the jail presented a serious medical need, to prevail on his § 1983 claim, he must also show the defendants' deliberate indifference to that need, in essence, their "subjective recklessness" and unreasonable response, despite knowledge of his serious medical condition. *See Farmer*, 511 U.S. at 839-40. In short, "an official acts with deliberate indifference if he had actual knowledge of the prisoner's serious medical needs and the related risks, but nevertheless disregarded them." *DePaola v. Clarke*, No. 16-7360, 2018 WL 1219611, at *3 (4th Cir. Mar. 9, 2018).

It is not the function of prison administrators or nurses, however, to second guess the good faith treatment decisions of licensed physicians. *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995). Administrators and nurses "cannot be liable for the medical staff's diagnostic decisions" or "substitute their judgment for a medical professional's prescription." *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002). In addition, an official's inadvertent failure to provide appropriate medical care, or an inmate's mere disagreement with a doctor's medical judgment do not

---

[5] Ratcliffe alleges that when he saw an eye doctor *after* leaving the jail, that doctor diagnosed astigmatism in both eyes and ordered Ratcliffe some glasses. This later diagnosis and treatment from a specialist cannot prove, however, that Ratcliffe's condition while at the jail presented an obvious and serious medical need, in the face of the defendants' evidence from Dr. MacDonald that it did not.

constitute deliberate indifference. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

It is undisputed that neither Russell nor Nurse Quesenberry is physician. As such, they were entitled to rely on the medical judgment of Dr. MacDonald, the medical professional charged with treatment of Ratcliffe's vision complaints, as to whether the medical care provided and its timing were appropriate to meet his medical needs.[6] *See Shakka*, 71 F.3d at 167. Thus, they did not have the requisite level of awareness of risk to support a finding of deliberate indifference. *Farmer*, 511 U.S. at 837 (requiring proof defendant knew of risk and its seriousness and failed to respond reasonably). They could lawfully rely on Dr. MacDonald's decisions about whether Ratcliffe's vision-related complaints required immediate attention from an eye specialist or whether his headaches warranted a prescription for pain medication.

Moreover, Ratcliffe fails to present any disputed fact showing that Russell, Nurse Quesenberry, or anyone at the jail ignored his vision complaints. While there, Ratcliffe received two vision acuity tests, review of his chart and later, an

---

[6] Nonmedical or nursing staff can be liable under § 1983 if they fail to provide an inmate with ordered medical care, deliberately interfere with the prison doctor's performance, or tacitly authorize or are indifferent to the prison doctor's constitutional violations. *E.g., Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990). Ratcliffe presents no evidence that Russell or Nurse Quesenberry interfered with, or failed to provide, any treatment ordered by Dr. MacDonald, who is not charged with any constitutional violation in this case.

eye examination by Dr. MacDonald, and pain medication. Furthermore, both Russell and Dr. MacDonald, independently, decided to send Ratcliffe to an eye doctor, even though neither believed such a referral to be medically necessary for his condition. Ratcliffe's desire for different medication and an earlier eye doctor referral is nothing more than a disagreement with the doctor's medical judgment that his condition did not require such care. *See Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) (finding "the essential test" for constitutionally required health treatment "is one of medical necessity and not simply that which may be considered merely desirable"). Nurse Quesenberry also offered Ratcliffe the alternative of paying his own way to schedule an eye doctor visit even without Dr. MacDonald's finding of medical necessity. Thus, jail officials did not prevent Ratcliffe from obtaining eye care, and he states no disputed fact to show that because of his indigency or for any other reason, the defendants denied him treatment they knew was medically necessary.

Finally, the defendants' actions delayed Ratcliffe's treatment by an eye doctor for about four months. "A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir. 2015) (unpublished). Other than his own speculative conclusions, Ratcliffe offers no evidence that the four-month delay caused his vision change to worsen or that

his uncorrected vision caused his headaches or any other pain or dizziness. Moreover, he admits that he was provided Tylenol for pain.

For the stated reasons, Ratcliffe cannot survive the defendants' motion for summary judgment on his § 1983 claims concerning his course of medical care at the jail. I will grant the defendants' motion and deny Ratcliffe's motion as to these claims.

## C. No Negligence Claim.

Ratcliffe contends that the defendants negligently addressed his medical condition. The Virginia Medical Malpractice Act requires any party alleging negligent medical care to obtain an expert's certification of merit prior to serving process upon the defendant. *See* Va. Code Ann. § 8.01-20.1. "Expert testimony is ordinarily necessary to establish the appropriate standard of care, a deviation from that standard, and that such deviation was the proximate cause of damages," the elements of a medical negligence claim. *Beverly Enters.-Va. v. Nichols*, 441 S.E.2d 1, 3 (Va. 1994). A plaintiff's failure to present the expert certification as required is grounds for dismissal except where the "plaintiff, in good faith, alleges a medical malpractice action that asserts a theory of liability where expert testimony is unnecessary because the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience." Va. Code Ann. § 8.01-20.1. Courts have applied this exception only in "rare" circumstances in

which a layperson would have known the requisite standard of care without expert assistance. *Brembry v. United States*, No. 7:10CV00388, 2011 WL 121741, at *7-8 (W.D. Va. Jan. 13, 2011).[7]

Ratcliffe has not obtained the requisite certificate of merit. He also has not presented evidence that his vision condition was so simple to treat that the exception should apply. A layperson would not have known whether the change to Ratcliffe's visual acuity from 20/20 to 20/70 in a few months triggered a standard of care requiring additional diagnostic testing or an immediate evaluation by an eye specialist, or what harm (if any) was caused by delay of that evaluation. Similarly, a layperson would not have known whether the standard of care for Ratcliffe's headache complaints required some stronger pain medication than Tylenol. For the stated reasons, I will grant summary judgment for the defendants on Ratcliffe's claim of negligence regarding his medical needs and will deny his motion.

D. No Claim about Grievances.

I will also grant summary judgment for the defendants, and deny Ratcliffe's motion, as to his grievance procedure claim. Inmates do not have a constitutionally protected right to a grievance procedure. *Adams v. Rice*, 40 F.3d

---

[7] In *Brembry*, the court cited examples where no certification was required: a food tray left for patient with a history of serious choking incidents or nurses waiting half an hour to respond to a bed-ridden older patient's call for help, despite past incidents when she had left her bed after her call went unanswered. 2011 WL 121741, at *8.

72, 75 (4th Cir. 1994). Consequently, the allegations that jail officials under Russell's supervision delayed Ratcliffe's access to the jail's grievance procedure did not deprive Ratcliffe of constitutional rights and are not actionable under § 1983. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 755 (2018).

### III.

For the stated reasons, it is **ORDERED** as follows:

1. Ratcliffe's Motion for Summary Judgment (ECF No. 24) is DENIED; and

2. The defendants' Motion for Summary Judgment (ECF No. 51) is GRANTED as to all of Ratcliffe's claims herein.

A separate Judgment will be entered herewith.

ENTER: March 26, 2018

/s/ James P. Jones  
United States District Judge